Circuit. This is Day 3 of the panel's arguments, and the last day of them. We have two cases on the docket for the morning. First case is Gary Bradley v. Gatehouse Media. We'll start with Gary. Good morning. I'm Jeff Weisbart. This is my partner, Sarah James. We're from Austin, and we represent Mr. Bradley. Fundamentally, we're here in this case. You might want to speak up a little. Yes, ma'am. And I have trouble hearing, too. I appreciate that. Fundamentally, Your Honors, we're here in this case because our trial judge had a misunderstanding of the summary judgment facts, and it's very important that I go over some of those facts, particularly the basics, so that those errors of misunderstanding are cured so that we can go forward and the Court can truly understand what happened. So let me give you a little bit of backdrop. Mr. Bradley has lived in Austin for quite some time. He was a founding member of the River Bend Church. He served in that church on the council up until the time that its original pastor retired. We have read the facts. I'm sure you are more engaged in the facts, but we've read them. The thing that I'm not understanding is your opponent has said he had already left the church by the time this mess happened with So why is there any causation? Let me explain that, Your Honor. Okay. You have to understand the facts on this. When Mr. Bradley had approached the council and they had made the decision they were getting nowhere and they went to the statesman, Mr. Bradley became frustrated and he removed himself from his Sunday school class. The communications at that point had been with the church council, which is six and seven members of the church, the body, and some of the staff. That's all that knew that he had an internal grievance with the church. When they made the decision to publish the ad in the paper, the ad, which is part of the record, disclosed externally a whole significant amount of information about the discord in the church, and at least from Mr. Bradley and the group's position, went public to all of Austin. That is a far cry and significantly different than having the council and some of the staff know. So when he removed himself from the class, he was out of frustration. But if you look at the rest of the information in his e-mails, for instance, or his testimony, what he said was, and in those e-mails, he continued to have a relationship with the church. You'll see in the e-mail he continues to counsel with the assistant pastor. You will see that he still has suggestions for the group about how to make the church better. What happened to him... Was his point that he wanted to go back? He felt he had the choice to go back. And now he thinks he doesn't? He thinks he does not, because there has been now public exposure that he was the one who placed the ad in the Statesman that then went public with the concerns, as opposed to internal concerns with staff members and with the council, who we all know change over time. From his position, he felt that he was mortified that people knew that he took internal issues with the church, and particularly with Dr. Haney, the pastor, and published them. And if you look at the article, the advertisement, it's pretty significant in terms of its outreach for the problems that he and his group believed were occurring at the church. And there's a difference. So to answer your specific question, Mr. Bradley knew that some people at the church knew. And if you look at this record carefully, you will see some people equals the 6 to 7 members of the council, the few staff members that worked for him, and he testified that a few people, a couple people in his Verity Sunday School class knew. That's it. Then what happens is the ad is published, all of these issues are, everyone is wondering who published this ad, and the very thing that Mr. Bradley sought to have, which was a promise of confidentiality, was breached. That's a far cry indifferent than simply feeling like. Okay, and I mean, I'm well aware of the fact that he did not want that to be not anonymous, that his name to come out on the published document. But I'm trying to understand, again, what is his loss, and what is your best case for the concept that this is suable, this loss that you're saying he had. I'm just trying to understand that. Let me address the contract. There's no question there was a contract. Okay, the statesman has argued there was no oral contract, but we know there was a contract. Bradley paid, Mr. Bradley paid $3,400 for something. He says he paid for it for two things, the promise of confidentiality and the placement of the ad. So in Texas, we submit all the time to the jury, the pattern jury question that says, did he get the value of what he sought to get? We've cited that PJC. The jury, I understand and acknowledge, we're talking about $3,400. But the question is, did he get the benefit of his bargain? So to answer your question with regard to the contract, it's the question, did he get that? No, I understand that. That's not my point. My point is causing damages. So you have the issue of amount of damages, which we haven't yet talked about beyond you saying this $3,400, but the causation of damages. So I can have something I don't like, but it doesn't cause me damages. Not everything in the world that we don't like causes us damages, or we would all be suing all the time maybe. So please explain the causation of his damages. The causation of his damages was the disclosure that he placed the ad. And his belief that he was ostracized and everyone knew it. And that is, that warranty, that contract was given to him. That was the promise that made him give the credit card and pay the $3,400. So even if he didn't lose anything that he didn't already, he'd already left the church, so you're saying because he wanted confidentiality and he didn't get confidentiality, that's enough to get the $3,400 or whatever? I just want to be sure you're agreeing that he had already left the church. No, I was about to correct that statement. He had not left the church. You can see his email about that, and the one that they cite, you can see that he continues to spend time with the assistant pastor, and he references that in there. Is it in the record about tithes and offerings? What was he doing in connection with that? Is that part of the record? It is. The email is part of the record, and it says that he has met with the assistant pastor. I think he's seeking counseling. My question was, did he continue to pay tithes and offerings to the church? Do you know that? Is that in the record? That is not in the record, Your Honor. That's usually how I tell who's supporting the church. I understand. But I wanted to, Judge Haynes, at least respond to the way you said it. The evidence is not that he left the church right then. The evidence is that he stopped going to his Sunday school class. He clearly was frustrated. Well, he had already stopped going to the Sunday services a while before. Then he had that Sunday school class, and he left that. So the fact that you might talk to somebody from the church going forward doesn't really mean you're still engaged in the church. I'm trying to understand. Again, I'm not being disrespectful. He has whatever rights he wants on a church. I understand it could be horrific if you felt like a church you really loved is not that same place anymore. I get all that. But again, we're in a regular court where we have to find every aspect. I'm not saying you haven't pled it properly. I'm just getting everything. Yes. And listen, I certainly understand that the closing argument is literally this argument that it did not cause him any damage. But Mr. Bradley, his position is that when everyone found out that he placed the ad, that it was different. Because when you are inside the church, you bring your concerns to the church council. That's one thing. And you can have frustrations with that. And that church council is going to move. We're going to end up having people that change, and he can always come back to it. Now he feels that he has been branded as that person that exposed private information about the church and the concerns to the public. And that's specifically what he sought to avoid. That was not only the way it was promised. So in answering the question about what caused his damage, clearly the staff knew he was concerned about Dr. Haney. The church council, those six to seven people knew. But there certainly was not an exposure that they knew that he had. Okay, so let's talk about the damage. You mentioned the $3,400, but I didn't really understand you to be claiming you're entitled to the whole $3,400. And your opponent says, well, you know, we put the ad in the paper, so that is some part of the $3,400. So let's say, hypothetically, we send it back, and you've got your trial, and now I'm sitting on the jury. What would you argue to me I should award on the damages? I would argue, if you're the jury, I'd argue that he's entitled to his $3,400. Okay, so you are asking for the whole $3,400. Yes. Now, the jury is free, under the pattern jury charge, to decide, yeah, maybe not. Maybe it was a portion of that value. I'm well aware of that. You know, I was a state district judge in Texas, so I'm well aware of how that kind of thing works. But then the other question is, do you want to talk about his mental anguish? Because that would be, because to me, having a trial about the $3,400, while you're entitled to do that, if we otherwise agree with you, it seems like you would kind of like the other. So tell me about the mental anguish, and I know that that was thrown out fairly early. So what is your best ROA site that shows that his mental anguish was not just, ah, this is bad? Well, okay. And again, it was thrown out on a pleading stage. So my site is to the actual Document 7, which is our pleading at the time, which said that he was ostracized, felt ostracized, as a result of this public exposure with regard to, ah, that he was the one that put the ad in the paper. The summary judgment did not address, nor did we have to bring forward evidence of the mental anguish and prove all that. That was dismissed, in our judgment, on an incorrect assumption made by the magistrate and the district court that, well, these damages must have been caused by your complaining to the council, and people at the council would have known that, and therefore, you would have left the church. His pleading is that when there was public disclosure, he felt mortified, humiliated, embarrassed, and we, you know, were criticized for not using the magic words of severe mental anguish. But that petition, Document 7, pleads enough to be able to support the claim. And what's your best case for that proposition? Because, again, just being upset is not enough. And so there's some argument, I know it was a 12e6 or 12c, anyway, whatever, it was not a summary judgment on that point. But you still have to plead it pretty thoroughly. We did. On this point. And so my question is, what's your best case for the proposition that what you pled was enough? Well, Your Honor, I don't have those cases in memory. We've cited them. But the point is, in our cites, say that you do not have to allege just the magic words. If you look what we cite and what we allege is that that action caused him to be ostracized and have the humiliation and the concerns and the anguish that one would have from being rejected and rejected by the Church. At the pleading stage, that is sufficient. That was not challenged on summary judgment because it was already dismissed. We didn't get a chance to even bring forward any of the evidence of how it affected him and be able to put that into the record. Counsel, let me ask you, you started, but I want to make sure we understood the timeline. I think it's the timeline we have as a demonstrative, maybe from your friend on the other side, I'm not sure. I don't want you to go through all of it, but you wanted to start with it and didn't get very far. What in particular did you want us, what specifically did you want us to understand when you started by going through the facts? So I'm not asking you to go through it all again. What would you highlight for us that you want to make sure we weren't missing? Thank you, Judge. Well, if you look at page two of the summary judgment order, trial judge wrote, after 15 years, the church council of which Bradley was a part, at the time all this happened, that was not correct. And you can see his cite, he cites to document seven, page five, and believes that Bradley is part of the church council. And I see that I'm ... Please answer, but you have ... So then he writes, after 15 years, the church council of which Bradley was a part decided to vote the pastor's budget down and secure new leadership. To do so, the council, the council never put this ad in the paper. It was the private group, and he operated as a private member of the church. Later in this opinion, Judge Ezra points out that he is doing this on behalf of the church. And so when you look at footnote two, for instance, you realize where the mistake was made, because in dealing with the contract, Judge Ezra says Bradley pleads in the First Amendment complaint that he placed the advertisement with the statesman as a representative of the church. That is not accurate. He did not do that, and there's no question in this record about it. He then says that the parties did not expressly discuss the terms of payment, and Bradley presented himself as placing the advertisement on behalf of the church council. Sending the invoice to the church council would not only be reasonable, but certainly would not constitute a breach of confidentiality. He did not do this on behalf of the church, and it was ... Counselor, excuse me. Your point is the judge misunderstood his relationship with the council. Yes. Thank you, sir. I give up. Oh, please, please. There's a Verity class that Bradley was attending? That was something called a Verity class? Yes, sir. Is that the same as a Sunday school class? Yes, sir. It's Sunday school. This particular class had a moniker named Verity. All right. So what I read is that he attended that last ... The last class he attended was March 1st of 2020? Correct. And then it said he didn't go back to any classes. He did not. I guess my concern is, like in my church, I didn't go back to any classes because there weren't any in March of 2020 after a certain point. So March 2020 is COVID. So in terms of determining why he didn't go back to class, did the rest of the church continue to have classes through March, April, May of 2020? Do you know? The record does not suggest that. In all fairness, the emails that he sent did not reference COVID or not going back. He just references that he doesn't go back. Good morning, Your Honors. May it please the Court. Katherine Robb, and I'm here on behalf of the Gatehouse Media, doing business as the Austin American Statesman. I have my colleague Michael Lambert with me today. I want to start by addressing some of the questions that the Court asked my friend, Mr. Weisbart. As the Court has already sort of picked up on, one of the big issues here, certainly for us, is causation and damages. And it's our assertion that Mr. Bradley has neither adequately pled causation nor adequately presented evidence of causation or of damages. Okay. Is it fair to say that you have to agree there's fact questions on the contract, given what he said versus what the person he talked to said? And I'm sorry, when you say questions on the contract, do you mean on the... On whether there was confidentiality in this contract of putting on this advertisement. That is the case. He's saying, y'all agreed that it would be confidential who requested it. And there's a little bit of a difference in what he and the Austin lady says, but yet there is definitely evidence that supports the notion that it was intended to be confidential. Do you agree with that? I would agree there was some evidence that there was, that some level of confidentiality... Rebold, that's her name. I was not remembering. Yeah, Rebold, yeah. Was requested. I would disagree that there's a fact question over that, though. I think if you look at the record, it's, well, we won, there's, we raised the consideration for the contract. But putting that aside, I think if you look at the record and what sort of representations were made, when Mr. Bradley said, I want confidentiality, Ms. Rebold said, well, that's not something we really do. This is not, you know, this is not a journalistic operation. We're advertising. And she said, it's up to you to decide whether or not you would like to put your name on the ad. If you put your name in the ad, your name is in the ad. If you don't put your name in the ad, your name is not in the ad. Your information is not in the ad. Yeah, but he said that she said she would keep it confidential. And there is evidence that bigger ads, the after 5,000, are kept confidential who places the ad unless they want to put their name on it. So while that is not dispositive here, it is informative of the fact that confidentiality isn't something that Rebold had never heard of. Well, I think, I think there's a different question. The, if you look at, and again, is, as you just alluded to, that agreement was not actually ever looked at by the parties, was not ever signed. But what that agreement says is that the terms and conditions, that piece of paper is not to be disclosed. It doesn't say we can't ever talk about who's ever placed an ad. But I do agree with you that there were some discussions about other forms of confidentiality. And specifically what was discussed is Ms. Rebold made a representation to him that if someone called and asked, she would personally say she did not know. She did agree, and I don't know that she could have necessarily agreed for the statesman, but she did say that the statesman would not use this to run an ad. And she explained to him again that the advertising departments and the editor, and the journalistic or the editorial departments are very different. There is a strict separation between them that the editorial department, frankly, wouldn't have been interested in, in this issue. She understood how important it was to him, but it was not something that was really newsworthy. And not only would she not go tell him, they would not listen to her if she tried to go tell him. Let me ask you, the total price of the ad was $3,400? Yes, Your Honor. And he paid that at the time he took out the ad? Yes, Your Honor. What was the need for an invoice to be sent to anybody? I mean, standard, that's what they do, which they testify to. You send an invoice to somebody who already paid the entire bill? That's standard practice? Yes. So the evidence would bear out if we got past pleading that everyone gets an invoice no matter when they pay? That's what the evidence would show? I apologize for interrupting. I believe, yes, the billing department is a completely separate department, and they send something, and that's frankly not uncommon. I've received plenty of invoices before that say, you know, that they're zeroed out because I've already paid. Not with the statesman. I can't testify to that, and I don't, there's not records. You don't know what this invoice said? This invoice said zero. It said zero. It says it didn't pay. But the, that also is a little weird because the receipt went to him by email. Why would they mail a zero invoice? They have to pay for the stamp and mail it when they could have emailed the invoice if that's something they feel like they have to do. Why didn't they email it after they emailed a receipt to him? I do not know the answer to that question, and there's not evidence in the record of that, but again, this is a separate billing department. And that to me shows that it's a little questionable that this was needed and proper. Even if they send invoices, nowadays going by mail is something people try to, you know, not have to pay for when they do it a lot. I'm not saying not everyone does mail, and I'm not questioning mail. I'm just saying that here, because they sent the receipt by email, but then turned around and mailed to the church an invoice that wasn't even needed, that, you know, I could see a jury kind of going, huh? Well, I think the difference is here, Ms. Rebold, who had had the contact with him, personally forwarded the receipt to him. The receipt that, by the way, said on it, Riverbend Baptist Church. I know what it said, but it was sent to him. So he's not going to think, he might have glanced at it and thought it was just talking about the church as what's being discussed, but there wouldn't be anything in there that would indicate to them, oh, heck, now they're going to mail it to that address. So, again, y'all may be able to, if we send this back at a trial, explain it and all of that, but isn't that a little questionable, a little factual? No, I don't think it is. Again, I think these are separate departments. He went in, he spoke to someone who places advertisements. The billing department separately sent an invoice later, and I don't think, there's no evidence that says this was unusual here to send an invoice. This is the only time they, and I get your point, but I don't believe that he has, Mr. Bradley has introduced any evidence that this was unusual that an invoice was sent. It's not uncommon for businesses to keep records of transactions. It's not uncommon for invoices to be sent. I agree that more and more these days things are sent through email, but, again, this is a different, this is Ms. Rebold sending him the, sending him notice that, in fact, yes, you've paid, and a billing department, which, again, was at the time of COVID, just as that was starting, that sent the invoice by mail. So I don't think that that's any evidence that there was anything going on. Okay, let's assume, arguendo, we think that there is some question on that. Let's turn to the causation. He says, your opponent says, look, y'all were supposed to keep it confidential. Let's assume, arguendo, that you were. You didn't. Why isn't that enough of a causation of at least the damages on what he claims is a contract of confidentiality? Again, assuming, arguendo, that contract, which I know you disagree with. Well, first of all, and if I may sort of address the, and this, I'm answering the causation question, but I'd like to sort of put it in the context first of the pleadings and then of the evidence, if I may. So for the pleadings stage, he had to plead, at least, that there was causation. And while he said, while my friend, Mr. Weisbart, said here that he had pled that, I don't remember his exact words, but that there was evidence that the advertisement caused people to feel differently about him. If you look at the pleadings, it doesn't actually say that. I'd like to just very briefly walk you through what is and is not in the First Amendment complaint. Now, if you look at the First Amendment, amended complaint, apologies, what he says is he starts by, as Mr. Weisbart said, talking about how he was a founder of the church. He was on the church council for a number of years. He stepped down from the church council quite a number of years ago, and he had become disillusioned with church leadership. He was unhappy with church leadership. He went to Reverend Haney and requested a number of meetings. He was turned down. He then went to the church council and requested some meetings and did not get anywhere with them. He then felt that he and his group felt that they had no choice but to take out or to try to obtain new leadership. So they went and they placed the ad, an ad he calls controversial. As he discussed today, it was controversial. He did this in an attempt to get church members to vote down the budget. The ad ran on the date requested. He then says, the next thing he says is that he received an email from a member of the church council, again, the group that is aware that he is trying to replace Reverend Haney, and that he has both approached Reverend Haney and the church council already talking about how they would like to get rid of Haney. So it is sent to one person, a person who is already aware of this, but he does not allege in the First Amendment complaint that anyone else was included on that email or otherwise notified of that invoice. He does not plead that anyone else read the ad and started treating him poorly because of it. Now if you look, what he says is he says the invoice was sent or he received the invoice from the church council member, someone who knew. He then says, word spread, word, and he says he was embarrassed and humiliated. He never alleges that a single member of the church council told anyone else, or this one member, the only one who received it, told anyone else about the invoice for the ad. He never alleges that any church member other than that member ever became aware of the invoice. He never alleges that any church member became aware of his involvement in trying to oust Reverend Haney because of the invoice. He never alleges that any church member ever told him that they found out he had paid for the ad. He never alleges that any church member ever told him that because he had paid for the ad, they thought poorly of him, they wanted him to leave. He never alleges they ostracized him because they found out that he had any involvement in the ad. He never alleges that anyone said that it was the ad that turned anyone against him. So even if we take his pleadings at face value, as we're required to do for the 12C motion, and we believe his timing, which we actually know from the evidence is not correct, because as we've discussed already, he was already ostracized and he had already decided to leave the church prior to this invoice. But even if we believe that for these purposes, he doesn't ever allege that anybody turned against him because of the advertisement. For that reason alone, we believe that the mental anguish but we think the causation is sufficient to affirm the dismissal of the mental anguish on the pleading stage. We will of course have to deal with the shift to summary judgment. What do you say was the state of the evidence that might have filled some of the holes that you just identified? Is there any There's not specifically, well, there's not anything, no, there's no evidence either way about anybody ever knowing about the bill, either good or bad. I mean, it's not just that there's not evidence that people other than, sorry, let me rephrase that. There's no evidence that anybody outside of the one church member ever found out about the invoice. So I don't know that it matters that people otherwise knew. There's not any evidence and this is even after summary judgment. There's no evidence that any person ever turned against him because they saw the advertisement, they thought poorly of him because they found out that he in fact was one of the people behind the advertisement and suddenly ostracized him, made him feel as if he needed to leave the church. There's zero evidence. Not only is there no pleading of that, there's no evidence of that. If you and I signed a contract that said you will keep X confidential and then you went and told Mr. Weisbart X, okay, let's say those are all the facts that I give, why isn't that a violation of the contract? Well, this gets to your earlier question about whether or not the contract had the requisite level of I'm asking a hypo and please answer my hypo. My hypo is you and I signed a contract that you will keep X confidential and then you went and told Mr. Weisbart X. Isn't that a violation of the contract? I think if you and I signed a contract and I said I will keep, I'm sorry, was your name confidential? X. X confidential? Perhaps that would be. I don't think that's the situation here though, Your Honor. I apologize. It's been a long few days. I believe that would be. This was not the situation. First of all, this is obviously an oral contract. This is not something between just you and me where I can say I can make this representation. This is, I think this is a very different situation. And that's our argument on the fact that the contract itself, separate from the damages and causation which we think were not, were neither pled nor proven at the trial court level, we think the contract was not actually definite enough that a court could determine the contours of it and whether or not there was a breach. Again, there were some very specific things that were said. And Mr. Bradley? You say you don't think the contract was definite enough? Is that what you said? Yes, Your Honor. If he said don't tell anybody I took out this ad, what else would you need the ad to make it definite enough? Well, she didn't tell anyone that they took out the ad. The question is, I mean, this was not a situation where somebody went and said, I mean, first of all, what he said was I need to place the ad confidentially, which he did. His name was not on the ad. There was nothing on the ad that identified him. No one, I mean, it didn't, it went out without any identifying information on it. But what didn't happen here is he didn't discuss the invoice. There was no discussion about how do we keep what he appears to want sort of complete confidentiality. You know, how are the records kept? This is not a situation, the ad itself was confidential. This is not a, this is not a question of Amber calling someone or Amber putting his name on anyway or doing something else. This is admittedly, you know, an unfortunate situation, but this is not a situation where... You don't mean the ad was confidential. That's not what you meant to say, is it? The ad was run in the newspaper. Well, it was anonymous. I mean, it was, when he said I need to place it confidentially, it was anonymous. She said, you know, your name won't be on it if you don't want your name on it. You get to decide what's on it. So it was placed, maybe confidential is the wrong word there, but anonymously. It did not identify him in any way. But I don't think that there was the requisite level of, again, definiteness, for lack of a better way to say it, in this conversation about, you know, the time, the terms, what was she supposed to do to ensure that no one ever found out? Again, he doesn't allege that she broke any of the agreements that she made to him. And if I may just quickly, and you see I'm running out of time, I'd like to really just get back to a question you all asked earlier about the actual damages. So, as I've said, I think we've shown that we don't believe there's any emotional distress damages, either pled or proven, or any other sort of way to quantify damages based on anguish or relieving the church due to just the fact that the invoice was sent. On the breach of contract otherwise, even assuming there was a contract and it was breached, we don't believe there's any damages. Mr. Bradley admits he paid $3,400. He asked the price of the ad. This is all in the record. He asked the price of the ad, and Amber told him. Yeah, but if you agree on, okay, I know that the regular price is $3,400, but let's suppose that it's supposed to be a black and white, but you all agree that the ad I'm going to put in, you'll put in red and blue, and you agree to that, even though normally you charge more, but you're willing to agree to do it for $3,400, and then you don't. Why isn't that still something I could sue on and get damages for? Because you had agreed to it. So, I don't know that that wouldn't be, but that's not what happened here. He agreed that the ad was exactly what he requested. It was run with the text he wanted. It ran on the dates he wanted. But it was not kept confidential. That's the part. Well, the ad in the newspaper, but just because you put it in the newspaper without his name on it, but then you send out an invoice that tells them who it is, that's not confidential. So, again, while I understand the regular cost, the fact that you can always agree, you could have discounted it. You could say, well, we normally charge $3,400, but we'll charge you $3,000. I mean, you all can always discuss this and agree on something. So, the fact that you all charge the regular $3,400, but assuming Arguendo agreed to the confidentiality, I don't see why that doesn't add to the... Well, I apologize. I didn't mean to... Go ahead. I apologize. I'm just running out of time. So, I think even if, and again, we don't concede there was a breach, but even if there was, we don't believe there were any damages because he got exactly what he paid for. He paid $3,400. He admitted he didn't pay any more. He didn't offer to pay any more. In fact, he even says in the first amended complaint, and I will acknowledge that this is when he's discussing negligence, but he actually says that the statesman made a gratuitous promise and that it did not require him to pay any more. So, $3,400 is what he was told. He said that both, he admitted to that in the deposition. That's what he was told the ad cost. That is what he paid. However you look at this, there simply is no delta between what he requested and what he received. Let me ask you, insofar as this extra agreement, let's say it was actually in a written agreement. I will keep it confidential. I, Austin American Statesman, will keep it confidential. Simply part of your argument is that what that means was not at all clear and it was enough that the ad itself was anonymous, confidential in those terms. So I think your argument doesn't really depend on it not being in writing. It's that it's unclear what confidentiality means and sending the bill may well not have been inconsistent with confidentiality. Yes, Your Honor. Yes, Your Honor. That's correct. There was nothing discussed about the invoice, nothing discussed about how I mean, there may have been, there was obviously discussion about Well, that seems to me perhaps then to be a fact question, not so much dependent on whether it was in writing or not, but what confidentiality meant in this particular agreement. Well, I don't think it is a fact question. I think that's whether or not the contract is definite enough is a question of law for the Court. There aren't actually fact questions over this. Both parties have testified to the certain representations that were made. They wouldn't place, if Amber said personally if someone called, she wouldn't disclose that he was the one. She wouldn't put his name on it. They wouldn't run an ad on it. They both in their depositions talked about confidentiality. She talked about how, in fact, she didn't have confidential sources and that was why she kind of said, you know, what he meant. He kind of, again, referred it to as kind of like a confidential source. Those we separately in our pleading talked about how those have been found unenforceable. I see my time is done. If you have questions, I'll otherwise. Thank you very much. Thank you. And just in closing, we would ask obviously that the Court affirm the trial court's orders in all respect. We did also give y'all, and I know you saw it. Well aware. Thank you, Your Honors. Indeed, Mr. Weisbart, do you want to say something about this document they gave us? Well, I guess what I would say is it is not complete in the sense that it does not reflect the full statements that were made. You can see in his testimony that he went beyond when he was, for instance, on the email about how he referenced this to his, the group. That he then went on to say that, well, he was not at the meeting. He felt bad that he couldn't be at the meeting and was trying to lighten up the mood of the group who had been battered at that meeting and then went on to say, but I knew at that point that this agreement had been reached and I was upset by it. And so it does not accurately portray what actually took place. Judge, in my short time, I want to answer the question that you asked me with regard to the precedent that, with regard to that. It is the Southwest. The reason I point to that is because it says severe emotional distress includes all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation. Our pleading, which was dismissed at the pleading stage, said, Bradley found out on March 18th when he received an email from a member of the church council with an attachment of the invoice. As word spread, Bradley was embarrassed. That's an element of that. Bradley was humiliated. Okay, but they claim that there's no assertion in the first amended complaint that anybody other than Bradley was embarrassed and humiliated. Members of the church, especially those who supported Haney, began treating Bradley as if he were an outsider and a traitor. These events led Bradley and his family to the heartbreaking decision that they had to leave the church. Now, what seems to be implied and argued is that when they stopped, going to the Sunday school class, well, that was when he left the church. But Bradley's testimony would be, and the distinction is that now it was known that he had publicly aired these issues to all of Austin. And he was humiliated and embarrassed. That's different. What are you reading from? This is document 7, page 6. It is our first amended complaint. Okay, so you're saying that's sufficient to plead the mental anguish? That's sufficient to plead that people beyond Colletti knew that he was the ad person, the person who threw the ad in the paper? That's exactly what I'm saying. And we cite one of the Fifth Circuit cases that says at that pleading stage, we have to give factual context for these allegations. Just don't put in the word severe mental . . . Well, that takes . . . we'll deal with how that handles the mental anguish. But still moving into summary judgment on the rest of the case, mental anguish being out of it, what evidence was there that it was the bill that caused somebody other than that one person to be aware that your client had placed the ad? Any evidence of that? No. If your client testified, I was told by A, B, and C or just by A would be good, that that person learned because of the bill? And if not, where does that leave you? Judge, I did not bring forward any of the evidence because it wasn't part of the summary judgment. But it is evidence as far as causation on your damages. It's not just mental anguish. It's your breach of contract and whatever else. Are you saying it's sufficient that one person learned by receiving the bill? That is sufficient. To breach your warranty and your contract? Yes, sir, it is. And if you look at it from the viewpoint of Bradley, Bradley was . . . he went to the statesman to get a promise. He got the promise. He paid $3,400, and that promise was broken. The fact that Bill Colletti, who he knew was part of that council and part of that group, now knew he placed the ad caused him humiliation, caused him embarrassment. And whether it's one or it's a hundred, it's still that he experienced that. And so, while that part of the case was not brought forward on summary judgment, the fact that you're asking him to feel embarrassed, humiliated, and know that it was different. All right, counsel. We have your argument. Thank you. Thanks to you both for your assistance to us in this case. That's it.